Well, it's still good morning. Good morning, Your Honor. May it please the Court. Josh Benson on behalf of the plaintiff and appellant Stone Creek. I'd like to reserve four minutes for rebuttal. Your Honor, the central issue before this court is whether Omnia's blatant, bad-faith, intentional use of the Stone Creek mark that was designed with the intention to deceive consumers classifies its infringement as willful. We urge this court to follow its long-standing history and definition of willfulness, which places Omnia's actions squarely within that definition. The district court committed legal error when it analyzed the facts and this circuit's definition of what willful to say, yes, it was willful, but there was no actual damages that flowed from the infringement. Are you saying that if the infringement was willful that somehow damages are mandated? To address both those questions, Your Honor, the district court found that Omnia's actions were not willful. They found that they didn't meet the willful definition by this circuit court. Not that, okay, but it was, but it had to do with that they weren't doing it to, to, to, for deception, to, to get on the good reputation or whatever, that they were saying they did it on purpose, but not with the, exactly, so they found it to be intentional, which I guess this circuit has said disgorgement of profits can be found with intentional or willful infringement. So they found it intentional, but they didn't find it willful because of that intent factor. And, and I'll, I'll move right into that intent factor because that is a keystone of, of what this appeal is about. When we were before this court on Stone Creek One. Hard to defend the proposition that I ripped off Sony, but I didn't do it with malice. Somehow the two don't mix. I tend to agree with you, but don't you still independently have to prove damages? We have to prove, we don't have to prove our damages. We've elected a remedy of disgorgement of profits. So we have established. You have to show some correlation between what they did and what, and that you have to show somehow that you would have been entitled to that money, that they're benefiting from that. Well, there's, there's many different theories of recovery to kind of move away from the willfulness and, and focus on the damages, which the district court really didn't even get to, on whether or not. They just stopped at willfulness, said you weren't willful, you're not entitled to any disgorgement. On this, and the Stone Creek, they, the district court also said that they, that Stone Creek didn't have any goodwill in the Midwest, right? They, they did find that, and that's, that's part of the error. Let's look back at Stone Creek One. Well, was that, okay, yeah, I've seen you all before. Yeah. I'm the only, yes, I'm the only one. It's good to be back in front of you on this, on this stage. It is, it is deja vu for some of us. Right? So if we look back to Stone Creek One, Your Honor, right, and that's where we looked at the sleek craft factors, and this intent to trade off a goodwill. Courts throughout our circuit, the Tenth Circuit, have found. But in our mem dispo of the first appeal, we said we didn't disturb the findings of the district court, right? Correct. The findings weren't an issue on that, on that specific case. So in the first time, didn't the district court find that, that Stone Creek lacked any goodwill in the Midwest? They, they did find that, but that was part of the problem with Stone Creek One. That was part of our challenge. I know, but in the mem dispo, if we didn't disturb that, then isn't that law of the case? It's not law of the case because it wasn't specifically articulated and argued before the circuit. So law of the case precludes a or a lower court from disturbing a higher court's findings of fact or conclusions. And we were here on that precise issue. We argued willfulness, and the court didn't decide it and sent it back down. So that was that keystone point, that touchstone of, of, hey, there's no goodwill. We argued that, and it was sent back down. So we are now appealing that issue. It's never been established whether or not we have goodwill in that area, right? We, we contend that we do. Well, and you're, you're claiming that you are entitled to all, the entirety of Omnia's $4.5 million in gross profits. And why, why wouldn't that be a windfall? Well, it's not a windfall because of the equity that would be considered by this court. So there's... But doesn't the statute? I'm looking at the... Okay, yes, Your Honor. So it's 15 U.S.C. Section 1117A, and it allows for the disgorgement of profits, if it, you know, for a willful violation. But it says that such a reward, quote, shall constitute compensation and not a penalty. So if we agreed with you that the district court was wrong and this infringement was willful, if the district court is correct that the profits are not attributable to the infringement, do you agree that you don't recover those damages? It has to be attributable to the infringement, right? Correct. Has to be attributable to the mark and the infringement. So the reason I don't agree is, is because this is not a penalty, right? We have to show equitable basis to get a disgorgement of profits. And that equity is the willfulness. So as the, the Tenth Circuit has articulated that part of the basis for requiring a disgorgement of a penalty, that's deterrence. There's two ways. But there's, I mean, you're kind of running in circles here because you've agreed that the statute says it has to be compensation, not a penalty. And the Lanham Act doesn't allow a windfall. And you have to, the profits have to be attributable to the infringement. So they acknowledge that they infringed the mark. They deny that they did it for the purpose of trading on Stone Creek's goodwill, that they did it for other reasons. And the district court accepted that. But nonetheless, they're also saying the district court agreed that their sales in the Midwest were not attributable to the mark. That they didn't make any money off this because of the infringement, which means, if that's correct, what you're suggesting is that as a matter of equity, that should be awarded to your client as essentially a punitive damage because it's not an actual damage. It's attributable to the violation. Correct, Your Honor. So we do have to, we, there needs to be attribution. But the burden on that shifts to omnia. Omnia has to show that sales were demonstrably not attributable to the infringing. And of course, this ties into another issue, which is the survey evidence, where they did present evidence that essentially no one in the Midwest had ever heard of Stone Creek. And there's no suggestion that anyone bought their leather couches from this other entity, Bon Ton, because of the Stone Creek mark. Now, I understand you argued that that evidence shouldn't have been admitted. But nonetheless, they did submit evidence. And there was evidence about the very, very tiny percentage of Stone Creek's gross sales over the years that had ever been in the Midwest, and that there were none in the relevant time period. So there was evidence. It wasn't just as if they just blanketly said, oh, no, you can't, you have to prove it and attribute it to our violation of the mark. Well, I think that evidence, one, it contradicts the findings of Stone Creek one, and the decision that we had actual confusion demonstrated in the Midwest. You had actual confusion on the one person calling about a warranty claim as opposed to one person believing that your client had anything to do with the couch when they bought it? Right. And we also had people inquiring through email about, hey, where else can I find your product in this area? What other stores do you have? What other showings of actual confusion? And if you look at the survey evidence that the district court relied upon, one, it's our position that it should be thrown out, that it was an abuse of discretion to admit it. But if it's used, it doesn't go to the question presented on attribution. Attribution specifically says that they must show what sales were demonstrably not attributable to the mark. And if you look at the Adidas decision by this court, they said a confusion survey isn't relevant to attribution because it does not ask people who actually purchased the product, hey, did you purchase this product thinking it was a Stone Creek mark? Did you purchase this product for what reasons? And so it doesn't even address the central issue on attribution, but the court relied upon it. And if we look to that survey evidence, it should have been excluded. One, the surveys were never provided to us under Rule 26. Number two, the surveys were hearsay. The only way to get over the surveys not being hearsay would be to rely on the residual hearsay exception. Well, what about Rule 703 that allows the expert to rely? It's data reasonably relied upon by their expert. Right. But that would need to be given to us. So, so But they say that it was given to you in the very same form that it was given to the expert, that the expert reviewed a spreadsheet or a table of the survey responses, not each person's individual response. And that seems to be the distinction. You acknowledge you received the spreadsheet and the actual data. You just didn't receive it separated out into separate documents, which neither did their expert, as I understand from the record. So how is this in any way something that their expert, that their expert relied upon something more than what you've received? Then he should have done a better survey. Well, that's different. That, that goes to its weight, not its admissibility. Right? I mean, sure, you can argue it's not a good survey, but that doesn't mean it's not admissible. But it's still, it still suffers from flaws when we want to meet that evidence and that hearsay exception. And I don't think there was any, any testimony at trial where their expert said, this is the type I usually rely on. He went out and did his own survey evidence to show that there was no likelihood of confusion. And in doing that survey, we wanted to meet that evidence because he said, I'm only surveying the people in the Banton trading territory. But when he surveyed people in that territory, it, we, we learned through zip codes that he was talking to people outside the territory, that we don't know what was included in there. And I know that he says most people didn't know what Stone Creek was, but actually over 11% of the people identified Stone Creek as a which I think's pretty high, given the fact that only 6% of the respondents had even shopped for leather furniture. But they do some math to make it look like it's worse than it is. But in the end, we don't know who responded to what questions and what their experience was in those situations. So that's not a survey applicable to attribution. And when we want to go to attribution, it is now their burden to show that the sales were not related. You could look at the, uh, Nintendo decision when, when you have, um, these various components of furniture or of, of, in that case, Nintendo cartridges. Um, and you can't distinguish between why this was purchased. Well, you get the whole thing. The whole thing has to be disgorge because those are ill gotten profits. You want to talk about Rule 68? Yes, Your Honor. Thank you. They better get to it. Then I'll move quickly to Rule 68, Your Honor. And this one's simple. We received an offer of judgment by two defendants. So it was a consolidated offer of $25,000. It was a joint, unapportioned offer. And under Ninth Circuit law, settlements are counted as judgments. Correct? Correct. So there was a $25,000, $26,000 settlement? It was confidential. So we put an affidavit in the record that it was over $25,000. And we told the court if they wanted more info, they would. In the end, we settled for more than $25,000 with Bonton. Right. Therefore, in the end, there wasn't two comparable numbers. And the district $25,000 plus zero equals $25,000, right? It doesn't equal zero. It equals 25 plus. Correct, Your Honor. And so when you compare that, we beat the offer of judgment. Was Lange your best case for that? I believe it is, Your Honor. And I believe it was the Johnson case out of a different circuit. Um, do you want to reserve the balance of your time? I do, Your Honor. So why don't we start where you, well, why don't you identify yourself? Good morning, Your Honors. May it please the court. Do you want to say who you are before we start firing? I never do. I have to actually raise something, but today I do. My name is Daniel DeCarlo, and I represent the defendants in the Appalese. Why don't we start where we finished? I don't understand this. It's a consolidated offer of judgment of $25,000, right? Yes. Under the settlement, there was a settlement for more than $25,000. Is there any dispute about that with one of the parties? No, there's no dispute. So $25,000 plus zero still equals $25,000, right? That's correct. So what's the point? It's very simple. And this is what Judge Ray has found, and this is what other appellate courts have found. This is what Judge Ray has erroneously found, according to some, one of the parties, right? Rule 68 is a very straightforward application. It instructs the district court to compare the judgment that was offered, and the judgment that was offered was an injunction and $25,000. Twenty-five plus. I'm sorry? Twenty-five thousand. Well, okay, but so you just completely say the settlement doesn't count. It does not count. Well, what's your authority for that? The statute itself reads quite plainly that you compare the judgment that was offered, and what was offered was $25,000 plus an injunction. You compare that with the judgment that was obtained, and the judgment that was obtained was an injunction and zero dollars. The settlement is not part of the judgment. What the Ninth Circuit Well, except for the Ninth Circuit has previously held that settlements count as judgments. That is in a case, Your Honor, when the entirety of the action was dismissed pursuant to a settlement. Therefore, the dismissal was one with prejudice. And so what the Ninth Circuit said in that instance is a dismissal with prejudice of the entire action is akin to a judgment. Under the under Rule 68, can a litigant merely offer a settlement that is not a judgment in general terms? I offer to entry of an injunction as an offer of settlement without any money. Yes, you can do that. And what case says that? Well, I'm not aware of a case that's been. It's the statute. The statute says that you can offer a judgment, and the offer of judgment Does it say judgment in monetary amount or just a judgment? It just says offer a judgment. All right. So I just say, well, I offer an injunction without any detail about what the injunction holds or anything, just an injunction. Well, the judgment has to, I mean, the offer of judgment has to be specific enough so that at the end of the day, the district court can compare. What about the morning of the day? I mean, forget the end of the day. I mean, just the injunction. Is that good enough or does the injunction have to be specific? I believe it has to be specific because in order for an injunction to be valid. What was the specificity of the injunction offer? I'm sorry. I don't have that in front of me, Your Honor, but it was a. I'm sorry, but I read the briefs. I didn't see any specificity in the injunction offer. I thought it was all about the money. It was not. The injunction specifically offered, I'm sorry, the offer of compromise under Rule 68 offered both an injunction and $25,000. All right. Thank you. I understand your argument. Let me ask one other question and then I'll defer to my colleagues. That is this free ride use of trademarks. So I go to New York from visiting from California, and I see a trade name that I really like. I say, that is really a cool trade name. And I come to California, I don't see a single one. So can I just start using that trademark here in the Ninth Circuit, just happily use the trademark until I get caught? Well, it depends, Your Honor. It depends on whether that trademark is federally registered and whether there's nationwide rights. It also matters whether that mark as a common law matter has come into the market in California such that it has, such that trademark rights in California are established. So it depends. So it all depends. I can get a partial free ride under, as long as I'm not caught? Well, I don't believe it's a free ride. Even if it's a registered trademark? I don't, if it's a registered trademark, Your Honor, those have nationwide rights. All right. Now let's talk about this case. Go from the abstract to the actual. Was the trademark here registered? After the, after the use of our client began, it was then registered. Yes. So during some of the time that you used it, it was registered? Yes, Your Honor. And- You guys weren't, you were even really cheap. You just made like a copy of it. You didn't even go out and do it again, right? What our client did was, was, was going, our client was going into a completely different market and for expediency, because he had warranty cards and- Like Xeroxed it or something. He chose the same name. This court, obviously, in Stone Creek One said that wasn't a prudent choice. But it wasn't- You mean he chose the same name by taking materials he'd received from, from Stone Creek and copying them, scanning them into a computer and just using it again? He actually made the materials, Your Honor, because my client's the one that manufactures the furniture. So he actually made the warranty cards and made the materials that was being shipped to Arizona, where the plaintiff is located. But I didn't understand that at this point, you were disputing that this was a trademark infringement. Well, Stone Creek One, this court told us it was a trademark infringement. Yeah, it's- So we're certainly not here telling the court that it's not an infringement. So you came before Judge Callahan, she says in the panel, and they say trademark, trademark infringement. Yes. And so you happily use this elliptical, the Stone Creek trademark. Yes. An ellipse, right? Ellipsical, an ellipsical trademark. For how long? I believe our use began in 2012 or 2013 and stopped as soon as we were notified by Stone Creek. We stopped. All right. Thank you. And the trial judge said, well, no harm, no foul approach to life. And that's because, Your Honor- He could have called it a free ride, but he called it a no harm, no foul. Well, and that's because, Your Honor, there's a difference between intentionally adopting the Stone Creek mark- And no question, but it was intentional? Correct. Because, yes, there's no question it was intentional. It was willful, it was deliberate, it was choose the word, it was all of the above. The Ninth Circuit has a very specific definition for what willful infringement is, and that's what's at issue. And willfulness requires a subjective intent to trade on the goodwill, to trade on the established value of that mark. Trademarks are not rights and gross. So the fact simply that the name is a good-sounding name is not what's at issue in trademark law. What is at issue with trademarks is the goodwill that stands behind it. All right. So I asked counsel for appellant about this. We said, okay, it's a trademark violation. No, and it's about as blatant as they come. That wasn't, trademark cases are usually really hard. That one wasn't really that hard. But the goodwill, there had been a finding in, before it came to the Ninth Circuit, right? And we said we didn't disturb the factual findings. Your Honor. And so had not the district court found that your client Omni had not traded on the goodwill? Correct, Your Honor. This court specifically instructed Judge Reyes upon remand to credit his factual findings. Factual finding 57, specifically he found that there was no willfulness because there was no intention to trade on the goodwill of the trademark. That was the goodwill part of it. But, all right. Correct. And so as the law of the case, Your Honor, asked my colleague about the law of the case. Well, it seems like, but you started this whole thing. There's no two ways. Your client started this whole thing by scanning and using this and committing a trademark violation. But then it would seem that Judge Reyes is not convinced that the appellants want everything that was made in the, you know, all of the profits that were made. And Judge Reyes is saying, well, you're not showing, you know, I'm not going to disgorge them because you're not showing that they had anything to do with that. Right. A completely independent reason, Your Honor, why the lower, the district court's judgment should be firm. All right. So let's assume that for purposes, hypothetically, that I agree with that. But I'm still struggling with the facts. Since you started the whole thing, then you have the chutzpah then to say, yeah, and why don't you pay us, too? I'm sorry. Pay, pay. Well, you pay the cost. Well, that's just an application of Rule 68. Well, but Lane says otherwise. I'm sorry? Lane says otherwise. And there was a settlement with Bonton for 25 plus, which would, if that settlement is credited, then you lose on that, correct? Correct. If we decide that. Correct. Yes, I agree with that, Your Honor. Is there a Ninth Circuit law that says that it's permissible under Rule 68 for multiple defendants to make unapportioned joint offers? They can. Was there a case? To answer the court's question, the same case that Your Honor is looking at, I'm sorry, the name escapes me. Lane. Lane. Yes. Unapportioned offers are problematic because you can't compare them with the ultimate offer made. That doesn't apply in this case, though, because the ultimate judgment is zero. So whether, let's say of that 25,000. Oh, no. If you define the offer of settlement as a judgment for purposes of the 68, Rule 68 analysis, it's not zero. It's 25,000 over 25,000 plus zero. Agreed. I agree with that. That is not under my math, equals zero. It equals 25,000 plus. Right. And what happened after the settlement? So claims against Banton were dismissed? Yes, Your Honor. Is judgment entered against Banton? I'm sorry, I don't remember if a formal judgment was entered, but the claims against Banton were dismissed as part of the settlement and the case continued on through trial with my client. So what's problematic to me is that Rule 68 speaks in terms of a party defending a claim may make this offer of judgment. It doesn't talk about multiple parties. And as you know, as a, well, actually, I'm sorry. I was thinking you were an Arizona practitioner. You're from Los Angeles. The Arizona Rule 68 is very different. It explicitly allows for unapportioned offers and joint offers and talks about what has to be included with respect to attorney's fees and costs. The federal rule's just downright skimpy in comparison. And so it's a little more challenging to say, did they beat the offer? I mean, that's the ultimate question. Did they beat the offer by refusing it and going and proceeding? And my difficulty with this unapportioned joint offer is there's no way to tell because they didn't go to trial against both parties. They just went with one. So you had an unapportioned offer and it wasn't as if when you made that offer to them, you said the money, the $25,000, will come from Bonton and the injunctive relief will be against Omnia. It wasn't specified. It was this joint unapportioned offer. So how do we tell? I mean, it just seems defective from the outset. The way we tell is we look at the judgment that was ultimately obtained. And the judgment that was ultimately obtained was the judgment against one party. You're looking at the judgment against one party, and you don't know if there was a second judgment. And then what do we do? We have to look at multiple judgments? I mean, you had multiple parties making an unapportioned offer? Yes. That's what you would have to do. It could be problematic if you can't tell who offered what. But in this instance, we don't need to worry about that because there is a single judgment against my client that is for zero and for an injunction. Okay. I think I understand your argument on Rule 68. I want to ask you to address this issue with whether any profits were attributable to the trademark infringement and what evidence was there that your client submitted that was admissible. There was some discussion about the testimony about there were no sales after they stopped using the mark, but that really wasn't admitted for that purpose. I mean, so what evidence was there? There was a plethora of evidence, Your Honor, and I will catalog that. First, I want to make sure that it's clear that that attribution part is an independent basis on which the lower court's ruling can be affirmed, even if this court disregarded Judge Reyes's finding on willfulness. Was this plethora of evidence that exists submitted to opposing counsel for their review prior to its offer at trial? Yes, Your Honor. All this evidence is in the record. And that's strange answers around here. Was it submitted to counsel before it was offered in evidence? Yes. Under the rules. And so there's no evidentiary defect in the introduction of the evidence? None, Your Honor. Counsel tells us that they had no opportunity to meet it, to challenge it. That's all incorrect? That is incorrect, Your Honor. Specifically, Mr. Benson is talking about the survey, I believe. The survey evidence, all of it, the survey data, the survey evidence, everything that Dr. Cowan, our survey expert, relied upon, was provided to the plaintiff. What the plaintiff is complaining about is the third party that actually administers the survey, the ones that go out and do the field work, when they provide that data to the survey expert, which is the way trademark surveys are done, they don't provide the names and addresses of the survey participants. So that information was not available to anybody. The third-party survey company does not provide that information. And I also have to correct something that Mr. Benson said about that survey. It was not a likelihood of confusion survey. It was a recognition survey. The specific purpose of it was to assess this attribution argument, which is, and that's evidence we submitted, which is that the survey that was properly done, there's been, I haven't seen any indication that it wasn't methodologically proper, that that survey illustrates that there was no recognition in the Bantan trading territory. And that's not hard to believe, because the other evidence presented is that the plaintiff is an Arizona purveyor of furniture. And so the people who know who they are are located in Arizona. And there was also the minuscule amount of sales that the plaintiff actually made in the Bantan trading territory. And so that evidence, and plus we also had another expert, a gentleman by the name of Doug Bonia. I see my time has expired. Another marketing expert who testified extensively also about the fact that there was a lack of recognition in the Bantan territory. And why and how people go about shopping for furniture. It's a very local endeavor. People go sit on the furniture. They feel the furniture. They need to have it delivered. So it's something uniquely local. And that's what Judge Reyes relied upon when he identified the attribution issue. I only had one other point that I thought was important to touch on, but my time is up. Did you want to hear the plethora? Do we have any questions? I think you finished the plethora. Is that correct? I did. There was one other point that I didn't get to that... Covered in your briefs? Yeah, it is. Then we're good. Thank you. Thank you. Your Honors, part of that plethora are the inherent attributes of the furniture that cannot be readily separated from the trademark, which the courts have stated, the Supreme Court, that you can't make this impossible separation between inherent attributes of furniture, the softness of them, the comfort, the location of them. And when we're looking at the attribution, part of the problem is one of the issues is these surveys is we didn't get their names and address, so we don't know these people. But if you even look to the other expert who admitted in his trial testimony, I don't know why anybody bought these. I don't know if they looked on the Internet. Our expert highlighted that if you purchase something over $100, you research it on the Internet. And when you do the Google search, the number one Stone Creek furniture is our client's website. Then they're going to attribute that product to them. What these surveys they then did that he said that nobody looks at trademark is it's essentially if you were asked the question of whether or not, why do people go to certain ballparks around here in San Francisco? And they list every possible reason except for the sport played. And then the conclusion is, well, nobody cares about what sports played when they go there. Well, so is it your conclusion that there's just no evidence? They have that all the evidence show that, well, okay, who has the burden to show that there's a link? Omnia has the burden to show that profits are not from the trademark. All right. And so is there no evidence of that? Correct. There's no evidence that these specific individuals who purchased it did so for any other reason other than the trademark. So if we look at the evidence and we decide there is some evidence and it supports that maybe we would have done it differently, but we think that there's enough, then you lose, right? Well, no, I don't see how you can get... We can't reweigh it. You're right. You can't reweigh it. So it's either there or it's not. But essentially, they're asking you to hold that trademarks for furniture should be abolished. And you're saying, and so for you to win, there's got to be zero evidence. For us to win, they can't show any evidence of apportionment. Okay. Thank you, Your Honors. Thank you. This matter will stand submitted. Thank you both for your argument. This court will be in recess till tomorrow at 9 a.m. All rise. And I was happy to see both of you today, but I don't know if I would be happy to see you a third time. But if it's part of my job, then that's what we do.
judges: Lucero, Callahan, Bade